Filed 8/31/23  Woodbridge Irrigation Dist. v. East Bay Municipal Utility Dist. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| WOODBRIDGE IRRIGATION DISTRICT, | C094234 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. 34201800232142CUCOGDS) |
| v. | |
| EAST BAY MUNICIPAL UTILITY DISTRICT, | |
| Defendant, Cross-complainant and Respondent; | |
| NORTH SAN JOAQUIN WATER CONSERVATION DISTRICT, | |
| Intervener and Respondent. | |

Plaintiff and cross-defendant Woodbridge Irrigation District (Woodbridge) sued defendant and cross-complainant East Bay Municipal Utility District (East Bay) for declaratory relief as to the parties' respective rights and obligations pertaining to water in the Mokelumne River.  East Bay responded, in part, by answer and cross-complaint, that Woodbridge's requests for declaratory relief were barred by a waiver provision in a 1965 contract between the parties.  Intervener North San Joaquin Water Conservation District (North San Joaquin) filed a complaint in intervention, asserting an interest in the dispute

1

between Woodbridge and East Bay on the grounds that any order or judgment requiring East Bay to provide additional water releases to Woodbridge from East Bay's storage facilities would hinder East Bay's ability to store water for North San Joaquin under North San Joaquin's permit.  Woodbridge appeals from the trial court's May 28, 2021, judgment granting East Bay's motion for summary judgment and North San Joaquin's motion for summary adjudication and denying Woodbridge's motion for summary adjudication.

Woodbridge raises two issues for our consideration on appeal.  First, it asserts, "[T]he judgment should be vacated and summary judgment reversed with respect to declaratory relief that Woodbridge waived its right to contest unlawful actions by [East Bay] concerning Mokelumne River water."  (Boldface & capitalization omitted.)  Second, Woodbridge asserts, "[T]he judgment should be vacated and summary adjudication reversed with respect to declaratory relief that Woodbridge waived the superiority of its water rights over those of North San Joaquin."  (Boldface & capitalization omitted.)  We find no merit in the arguments presented in support of the foregoing assertions and thus affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I

*General Factual Background*

Woodbridge has a pre-1914 water right to divert certain quantities of water from the Mokelumne River.  In 1924, East Bay filed Application 4228 to build Pardee Reservoir and to divert and store water from the Mokelumne River in the reservoir.  In 1926, the State Water Resources Control Board (Board)'s predecesor[1] granted Application 4228 and issued Permit 2459.  In 1928, Woodbridge submitted Application 5807 to the Board to secure an

---

[1]    The Board was created in 1967; all references in this opinion to the Board are to it or its predecessors.

appropriative right to divert and use water in the Mokelumne River, which the Board granted in 1932 when it issued Permit 3890.[2]

In 1938, Woodbridge and East Bay entered into an agreement (the 1938 Agreement) to resolve a complaint filed by East Bay against Woodbridge "to determine the extent to which [Woodbridge's] right to divert and use water from the Mokelumne River is superior to the right of [East Bay] to store, divert or use the waters of said river." The parties agreed Woodbridge's right to divert water from the Mokelumne River for beneficial use at its identified place of diversion "is prior to any right of [East Bay] to store, divert or use the waters of said river," but explained the amount of water available to Woodbridge under its prior right varies with the flow of the river into Pardee Reservoir, as detailed and specified in the agreement. It is undisputed: (1) the 1938 Agreement quantified Woodbridge's pre-1914 water rights for diversion and use as between 30,000 and 45,000 acre-feet per year, depending on the quantity of water flowing into Pardee Reservoir; and (2) East Bay agreed to release water sufficient to satisfy Woodbridge's pre-1914 water right between March 1 and October 15 of each year and not to object to Woodbridge's lawful diversions of additional water available below Pardee Dam in exchange for the ability to divert, store, or use water from the Mokelumne River under its Pardee Reservoir water right.

In 1941, Woodbridge filed Application 10240, seeking to divert more water from the Mokelumne River; East Bay filed a formal protest with the Board. The protest was resolved in 1947 and that same year the Board issued Permit 6931 to Woodbridge on Application 10240.[3]

---

[2]    "Anyone seeking to obtain an appropriative water right files an application with the [Board] [citation], which issues a water right permit. [Citation.] Beneficial use of water perfected under this post-1914 statutory scheme is confirmed by a license issued by the [Board]. [Citation.] The license is, in effect, a title or deed to the water right and is recorded in the county in which the diversion takes place." (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 429, fn. 6.)

[3]    As explained *post*, the Board issued License 8214 on Application 10240 in 1967.

3

In 1948, North San Joaquin filed Application 12842 to divert and store water from the Mokelumne River. In 1949, East Bay filed Application 13156 to divert water from the Mokelumne River at the proposed Camanche Reservoir. In 1952, Woodbridge filed a formal but delinquent protest to East Bay's application to build Camanche Reservoir. Following receipt of protests to North San Joaquin's Application 12842, East Bay's Application 13156, and other applications, including a protest filed by Woodbridge, the Board issued Decision 858 in 1956. Woodbridge protested North San Joaquin's application on the grounds East Bay was providing Woodbridge with releases of "certain stored waters" for Woodbridge's "exclusive use" and North San Joaquin's application "would interfere with the exercise of its rights, both to natural flow and to releases from storage."

The Board granted East Bay's Application 13156 and issued Permit 10478. Permit 10478 provides East Bay with both direct diversion and storage rights to water in the Mokelumne River. The Board further granted Application 12842 and issued Permit 10477 to North San Joaquin. Permit 10477 includes both direct diversion and storage rights to water in the Mokelumne River for a total not to exceed 20,000 acre-feet between October 1 and September 30. Permit 10477 is, however, a temporary permit that allows North San Joaquin to store or divert water only in years when East Bay is unable to make full beneficial use of its rights under Permit 10478.

In 1960, the Board issued License 5945 to Woodbridge and Woodbridge Water Users Conservation District (Conservation District) on Application 5807.[4] License 5945 provides Woodbridge with the right to directly divert water from the Mokelumne River, but does not provide Woodbridge with the right to store water.

In 1961, East Bay submitted a protest letter to the Board in response to Woodbridge's request for a license on Application 10240. East Bay argued Woodbridge's request demanded that East Bay release water that Woodbridge could not put to beneficial use and

---

[4] Woodbridge and Woodbridge Water Users Conservation District merged in 1993.

would require East Bay to release water before East Bay could make full use of its planned Camanche Reservoir.  The parties began negotiations to resolve their disputes, and each adopted the Principles of Agreement as a guideline to a future contract.

The Principles of Agreement provided the "purposes of the agreement are to facilitate maximum utilization of the water resources of the Mokelumne River and to resolve the points of controversy concerning the water rights of the parties to the proposed agreement and eliminate the possibility of litigation."  The parties intended for the Principles of Agreement to "effectuate a complete settlement between [East Bay] and the Woodbridge interests," take into account the prior 1938 Agreement, and define the water rights of the parties.  The parties agreed to undertake a joint study to "attempt to evaluate the yield of the water rights of [Woodbridge] with respect to the water rights of" East Bay, with consideration of "diversion demand schedules for the Woodbridge Canal at Woodbridge, operation of Pardee reservoir, including power releases, and such other factors as the parties agree to be relevant[.]"

The parties further agreed to attempt:  (1) "to develop a schedule of future water requirements for the Woodbridge irrigation interests, and, with respect to the yield of the defined rights, will develop criteria for the delivery of such total future water requirements on an average annual basis" and determine "to what extent East Bay . . . can supply the difference between the yield of the defined rights and the total future water requirements"; and (2) "to develop an operation schedule for Pardee and Camanche reservoirs to meet the total requirements of the Woodbridge irrigation interests to the maximum extent possible in the interim until the arrival of supplementary water supplies available to Woodbridge . . . and . . . Conservation District or while there is water available in the Mokelumne River which is surplus to East Bay['s] . . . increasing requirements."

In early 1963, East Bay completed several operational studies that analyzed the yield of Woodbridge's water rights under various hydrologic scenarios in relation to East Bay's operation of Pardee Reservoir (1963 Studies).  The 1963 Studies revealed that, in critically

5

dry years, Woodbridge would be able to divert only under its pre-1914 right pursuant to the 1938 Agreement, and there would be little or no water available in the river for Woodbridge to divert under its two license rights. This shortfall was due to the priority of East Bay's Pardee Reservoir right over Woodbridge's License 5945 and Permit 6931 and the fact that Woodbridge did not have any water right or facilities to allow for the storage of water.

Following completion of the 1963 Studies, the parties negotiated a "Key Features of Proposed Agreement," dated September 19, 1963. That document provided, in pertinent part: "Assuming Camanche Reservoir goes into full operation in 1964," East Bay would provide Woodbridge an interim water supply for ten years (subject to Woodbridge obtaining an alternate water supply or an increase in East Bay's needs); Woodbridge would pay East Bay "for the use of its storage facilities during the 'interim' period"; following the interim period, East Bay would continue to provide Woodbridge with 60,000 acre-feet per year as a "permanent regulated base supply," subject to a 35 percent reduction in dry years, at no cost to Woodbridge; these releases of water by East Bay would "fully satisfy all claims" of Woodbridge and Conservation District "as against [East Bay] rights"; and the parties would file the agreement with the State Water Rights Board[5] and ask that all future licenses conform with the agreement.

Also in 1963, North San Joaquin entered into an agreement with East Bay in which the parties agreed East Bay would store water at its facility and, upon determination that East Bay could not make beneficial use of the water, would allocate the excess portion to and release it for North San Joaquin's use under Permit 10477. East Bay completed construction of Camanche Reservoir in 1964.

In 1965, East Bay, Woodbridge, and Conservation District entered into an agreement (1965 Agreement). The 1965 Agreement provided that, since the 1938 Agreement, "permits

---

[5] The State Water Rights Board was one of the predecessors to the current Board. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 695, fn. 9.)

6

and licenses have been issued by the State to some or all of the parties hereto relating to the further appropriation of the water of [the Mokelumne River], and [East Bay] has constructed its Camanche Dam and Reservoir on said river downstream from its pre-existing Pardee Dam and Reservoir." The 1965 Agreement was intended to "settle and decide" all "contentions and disputes" made by Woodbridge and Conservation District "as to [East Bay's] use of the water of said river." The parties agreed "the direct diversion rights of [Woodbridge] and Conservation District to the water of said river, and the flow of water appurtenant to said rights, are insufficient to provide them with firm irrigation supplies each year without a supplementary source, and they expect to contract with the United States for supplemental water from the facility presently designated as the Folsom-South Canal when water is available from that source, and during the interim period [East Bay] will have surplus water, and after that period will be able to provide certain quantities of water on a permanent basis, from its Pardee and Camanche Projects, which water can be made available to [Woodbridge] and Conservation District on the terms and conditions hereinafter set forth."

Subject to several conditions, limitations, and specifications, East Bay agreed to provide Woodbridge and Conservation District with an interim water supply of up to 140,000 acre-feet per year until December 31, 1974. East Bay also agreed to, "from and after the termination of the interim period," provide Woodbridge and Conservation District with a "Permanent Regulated Base Supply" of 60,000 acre-feet of water from Camanche Reservoir for irrigation from March 1 to November 30 each year, subject to a reduction of 39,000 acre-feet in years when inflow into Pardee Reservoir is less than 375,000 acre-feet. In addition to the foregoing, East Bay agreed to release from Camanche Reservoir from March 1 to October 15 of each year an amount, in addition to the interim supply or permanent regulated base supply for Woodbridge, sufficient water to satisfy: (1) "[t]he rights of any riparian owners or appropriators prior in right to [East Bay] located below Camanche Dam and above the intake of [Woodbridge]"; and (2) "[l]osses between

7

Camanche Dam and said intake of the main canal of [Woodbridge], caused by evaporation and percolation."

The 1965 Agreement expressly states the parties' intent that the 1938 Agreement remain in full force and effect, except as modified or supplemented by the 1965 Agreement. The parties agreed: "Release of water by [East Bay] in the manner and in the respective quantities stated in [the 1965] Agreement, and the receipt and diversion by [Woodbridge] and Conservation District of water in the manner and in the respective quantities stated [therein], shall constitute full satisfaction and discharge of all responsibilities of [East Bay] for the release of water, and of all rights and entitlements of [Woodbridge] to receive and divert water, pursuant to the 1938 Agreement." The parties agree the 1965 Agreement does not address or limit Woodbridge's right to take water above the permanent regulated base supply when it is available from East Bay's flood control releases, subject to the terms and conditions of Woodbridge's license rights.

Pertinent to this appeal, the 1965 Agreement contains the following waiver provision, set forth in paragraph 19 (Waiver Provision): "The execution of this Agreement by all the parties hereto, and the performance by [East Bay] of the things to be performed by it hereunder, shall constitute and operate conclusively as a final satisfaction, discharge, waiver and release of all disputes, controversies, claims, demands, causes of action or other objections which [Woodbridge] and Conservation District, or either of them, now have or may hereafter at any time have, including those presently unknown or unanticipated, against or involving [East Bay] relative to the waters of the Mokelumne River and/or [East Bay's] collection, storage, diversion or use thereof; and [Woodbridge] and Conservation District, and each of them, hereby waive the provisions of Section 1542 of the Civil Code of the State of California. The foregoing provisions of this paragraph constitute a material consideration for the execution of this Agreement by [East Bay]."

The 1965 Agreement also contains the following consent provision, set forth in paragraph 20 (Consent Provision): "[Woodbridge] and Conservation District hereby agree

8

and consent, subject to the releases of water by [East Bay] as aforesaid, and to the diversions of water aforesaid by [Woodbridge] and Conservation District, to the collection, storage, diversion or use by [East Bay] of the water of the Mokelumne River for the purposes and to the extent specified in the permits heretofore issued by the State of California, or any department or agency thereof, to [East Bay], and in any licenses that may heretofore or may hereafter be so issued."

The parties agreed a copy of the 1965 Agreement "shall be filed with the State Water Rights Board by any one or more of the parties hereto, and such filing shall constitute the request by all of the parties to this Agreement that any actions by said Board relative to the issuance of a license to [Woodbridge] and Conservation District, or either, under Application No. 10240, Permit No. 6931, and any other proceedings by said Board relative to the water rights of [Woodbridge] and Conservation District, shall be consistent with the terms and conditions of this Agreement."

In 1967, the Board issued License 8214 to Woodbridge on Application 10240. License 8214 includes a direct diversion right from the Mokelumne River, but not a storage right. License 8214 specifically incorporated the 1965 Agreement, as follows: "Diversions by licensees within the maximum quantity set forth above shall be in accordance with the terms of [the 1965 Agreement], on file with the State Water Rights Board, or as said agreement may hereinafter be amended by mutual consent of the parties thereto." The Board thereafter issued License 11109 to East Bay in 1981 for Pardee Reservoir.

The 1965 Agreement was amended on four occasions. In 1974, East Bay agreed to provide Woodbridge with the interim water supply for an additional eight years until December 31, 1982, but at a reduced quantity due to East Bay's growing water demands. In 1983, the parties amended the 1965 Agreement to extend the interim water supply termination date to December 31, 1987, and thereafter on a year-to-year basis until 1992. East Bay ultimately terminated the interim water supply in 1988, however, as a result of a drought reducing inflow to Pardee Reservoir. The parties again supplemented the 1965

9

Agreement in 2003 and 2009 to address, at least in part, East Bay's concern regarding Woodbridge's proposals to sell water to the City of Lodi and the City of Stockton.

## II

### *The Present Litigation*

### A

### *Woodbridge's Complaint For Declaratory Relief*

In 2018, Woodbridge sued East Bay for declaratory relief. Woodbridge alleged a dispute with East Bay "regarding the effect of contracts entered between Woodbridge and [East Bay] on certain of Woodbridge's rights to divert water from the Mokelumne River." Woodbridge sought declaratory relief "to confirm that the parties' contracts did not compromise the seniority of certain of Woodbridge's water rights over certain of [East Bay's] water rights, did not restrict Woodbridge's exercise of its water rights to diversion of Permanent Regulated Base Supply, are premised upon [East Bay] exercising its water rights in conformance with the terms, conditions, and general water laws and regulations applicable to [East Bay's] rights, and did not authorize [East Bay] or North San Joaquin . . . to divert or store water under [North San Joaquin's] Permit 10477 prior to satisfaction of Woodbridge's more senior water rights under License 5945 and License 8214."

Woodbridge prayed for declaratory relief, as follows: (1) the 1938, 1965, 1974, 1983, 2003, and 2009 agreements between East Bay and Woodbridge (East Bay/Woodbridge Agreements) "do not release or excuse [East Bay] from the priority of License 5945 and License 8214 over [East Bay's] Permit 10478, because [East Bay] is no longer releasing Interim Supply to account for those rights"; (2) the East Bay/Woodbridge Agreements "do not release or excuse [East Bay] or [North San Joaquin] from the priority of License 5945 and License 8214 over diversions and storage of water under [North San Joaquin's] Permit 10477"; and (3) the East Bay/Woodbridge Agreements "are premised upon [East Bay] adhering to the terms and conditions of [East Bay's] water rights and other applicable laws and regulations, and that Woodbridge is not precluded under those [East

Bay/Woodbridge Agreements] from disputing or contesting [East Bay's] actions or operations relating to" (a) East Bay's "diversion, storage, and use of water released from headwater hydroelectric reservoirs"; (b) East Bay's "diversion, storage, and use of water for hydroelectric generation"; (c) East Bay's "storage and control of flood water releases"; and (d) East Bay's "diversion and storage of water for [North San Joaquin] under Permit 10477 without regard to the seniority of Woodbridge's Licenses 5945 and 8214." Woodbridge further requested a "declaration of any other relevant legal issues necessary to resolve this dispute between the parties" and attorney's fees and costs.

B

*East Bay's Answer And Cross-Complaint*

East Bay filed an answer to Woodbridge's complaint, asserting, among others, affirmative defenses of waiver and release. Specifically, East Bay asserted as its fifth affirmative defense that Woodbridge's complaint was barred by the "doctrine of waiver" because Woodbridge "intentionally, knowingly, and expressly waived all disputes, controversies, claims, demands, causes of action or other objections it may have had or may ever have, whether known or unknown, involving [East Bay] relative to the waters of the Mokelumne River and/or [East Bay's] collection, storage, diversion or use thereof." As its sixth affirmative defense, East Bay asserted Woodbridge's complaint was "barred by its express written release of all disputes, controversies, claims, demands, causes of action against [East Bay] relating to the facts and issues asserted in the Complaint or other objections it may have had or may ever have, whether known or unknown, involving [East Bay] relative to the waters of the Mokelumne River and/or [East Bay's] collection, storage, diversion or use thereof."

East Bay also filed a cross-complaint for declaratory relief against Woodbridge. East Bay sought a "declaration of the parties' respective rights and obligations under the 1938 Agreement and the 1965 Agreement, as amended by the Supplementary Agreements, confirming that the water sharing agreements between the parties provide that:  [¶]  a.  [East

11

Bay] is obligated to release the Permanent Regulated Base Supply, but is not required to release any additional water for the benefit of Woodbridge;  [¶]  b. Provided [East Bay] releases the Permanent Regulated Base Supply, [East Bay] may collect, store, divert, and use the quantities of water authorized under License 11109 and Permit 10478;  [¶]  c. Under the 1965 Agreement, Woodbridge waived and released any and all disputes, controversies, claims, demands, causes of action, or other objections that it may have at any time, including those unknown or unanticipated when it entered into the 1965 Agreement, against or involving [East Bay] relative to the waters of the Mokelumne River and/or [East Bay's] collection, storage, diversion, or use of water from the Mokelumne River;  [¶]  d. Woodbridge consented to [East Bay's] collection, storage, diversion, or use of the quantities of Mokelumne River water authorized by License 11109 and Permit 10478; and  [¶]  e. Provided [East Bay] releases the Permanent Regulated Base Supply[,] Woodbridge cannot be damaged, injured, or adversely impacted, as a matter of law, as a result of [East Bay's] full exercise and use of the quantities of water authorized by License 11109 and Permit 10478."

C

*North San Joaquin's Motion To Intervene*

North San Joaquin successfully moved to intervene in the action and filed a complaint in intervention for declaratory relief against Woodbridge.  As the trial court explained, North San Joaquin's "interest in this matter relates to its rights under Permit 10477 [citations], which permit [North San Joaquin] to store and/or divert up to 20,000 [acre-feet] of water."  North San Joaquin "asserts an interest in the dispute between [Woodbridge] and [East Bay] on grounds that any order or judgment requiring [East Bay] to provide additional releases to [Woodbridge] will hinder [East Bay's] ability to store water for [North San Joaquin's] use under Permit 10477

North San Joaquin prayed for declaratory relief confirming Woodbridge agreed that East Bay's obligation to affirmatively release water from Camanche Reservoir for

12

Woodbridge is limited to 60,000 acre-feet or 39,000 acre-feet as provided in the Woodbridge/East Bay Agreements, and that East Bay has no additional obligation to release water from Camanche Reservoir to Woodbridge that would impair availability of water under East Bay's Permit 10478 and North San Joaquin's Permit 10477.

III

*The Motions For Summary Judgment And Summary Adjudication*

A

*Woodbridge's Motion For Summary Adjudication*

Woodbridge filed a motion for summary adjudication as to East Bay's waiver and release affirmative defenses. The trial court explained East Bay's affirmative defenses were based on the Waiver and Consent Provisions in the 1965 Agreement. The trial court further explained Woodbridge argued the Waiver and Consent Provisions "when read in the context of the 1965 Agreement as a whole and in context of other pertinent evidence, indicate [Woodbridge] did not waive its prior rights under License 5945 and did not consent to [East Bay's] storage and diversion of water without first satisfying [Woodbridge's] License 5945 rights. [Woodbridge] also argue[d] it is unreasonable to interpret the 1965 Agreement as having waived [Woodbridge's] prior rights because the amount of water provided by the [permanent regulatory base supply] is too small to have been reasonably intended to satisfy those prior rights."

The trial court denied Woodbridge's motion. The trial court found the 1965 Agreement was intended to resolve all disputes between Woodbridge and East Bay concerning License 5945 and "the reasonable interpretation of the 1965 Agreement is that [Woodbridge] consented to [East Bay's] diversion and storage of water consistent with [East Bay's] licenses and permits in exchange for the benefits of obtaining a regulated permanent supply and a temporary interim supply, based, in part, on the understanding that [Woodbridge] would still be entitled to the direct diversion of flood releases and the

13

mistaken belief that an additional source of water would become available to replace the Interim Supply."

B

*East Bay's Motion For Summary Judgment*

East Bay filed a motion for summary judgment, or in the alternative, summary adjudication. The trial court granted East Bay's motion for summary judgment against Woodbridge as to East Bay's cross-complaint and Woodbridge's complaint. The trial court explained, in pertinent part: "The Court finds that the 1965 Agreement is clear and explicit in its intended effect to resolve all disputes between [Woodbridge] and [East Bay] concerning [Woodbridge's] pre-1914, License 5945 and License 8214 rights and [East Bay's] License 11109 and Permit 10478 rights. [Citation.] The first page of the 1965 Agreement acknowledges that new permits and licenses had issued since the 1938 Agreement, that new disputes had arisen between them concerning [East Bay's] use of the water of the Mokelumne River, and that the 1965 Agreement was intended to resolve all such contentions and disputes." The trial court set forth the Waiver and Consent Provisions in the 1965 Agreement and said, "The effect of these provisions is clear. On its face, the 1965 Agreement limits [East Bay's] obligations for releasing water to the [permanent regulated base supply] and for a limited term, the additional Interim Supply. There are no allegations that [East Bay] failed to release the [permanent regulated base supply] or during its duration until 1988, the Interim Supply. Thus, as long as [East Bay] continues to honor its obligations to release the [permanent regulated base supply], it is entitled to the protection of the waiver and consent clause and [Woodbridge] cannot assert its prior rights to compel [East Bay] make additional releases in excess of the [permanent regulated base supply]."

The trial court rejected Woodbridge's argument that the 1965 Agreement was intended to resolve only "those disputes being actively contested at the time of the agreement." The trial court noted, however, "even if [Woodbridge] is correct and the 1965

14

Agreement was intended to resolve only specific disputes, [Woodbridge's] evidence that [East Bay's] chief concern was the pending application for License 8214 does not demonstrate that License 5945 was not also in dispute."

The trial court further rejected Woodbridge's arguments that the permanent regulated base supply "cannot have been intended to satisfy [Woodbridge's] full water rights because the amounts are based upon the amount of acre-feet [Woodbridge] could divert even in a dry period" and, "because permits are made subject under the law to prior rights, [Woodbridge's] consent to [East Bay's] use of water consistent with its permits was subject to [Woodbridge's] prior rights." We do not go into the specifics as to the trial court's reasoning in that regard because it is immaterial to the issues raised in this appeal. Indeed, Woodbridge expressly states in its opening brief that it does not dispute the trial court's "ruling that Woodbridge contractually excused [East Bay] from any obligation to release additional water" "beyond the 'permanent regulated base supply' set forth in their contract."

In the judgment, the trial court granted East Bay's request for declaratory relief in its cross-complaint regarding the 1938 Agreement and the 1965 Agreement (as amended by supplementary agreements), as follows: (1) East Bay "is obligated to release the Permanent Regulated Base Supply, but is not required to release any additional water for the benefit of [Woodbridge]"; (2) provided East Bay "releases the Permanent Regulated Base Supply, [East Bay] may collect, store, divert, and use the quantities of water authorized under License 11109 and Permit 10478"; (3) "[u]nder the 1965 Agreement, [Woodbridge] waived and released any and all disputes, controversies, claims, demands, causes of action, or other objections that it may have at any time, including those unknown or unanticipated when it entered into the 1965 Agreement, against or involving [East Bay] relative to the waters of the Mokelumne River and/or [East Bay's] collection, storage, diversion, or use of water from the Mokelumne River"; (4) Woodbridge "consented to [East Bay's] collection, storage, diversion, or use of the quantities of Mokelumne River water authorized by License 11109 and Permit 10478"; and (5) provided East Bay "releases the Permanent Regulated

Base Supply[,] [Woodbridge] cannot be damaged, injured, or adversely impacted, as a matter of law, as a result of [East Bay's] full exercise and use of the quantities of water authorized by License 11109 and Permit 10478."

C

*North San Joaquin's Motion For Summary Adjudication*

North San Joaquin filed a motion for summary adjudication, asking the trial court to adjudicate whether East Bay has "a duty to release additional water for Woodbridge . . . (above and beyond the Regulated Base Supply defined in the 1965 Agreement) before storing water in Camanche Reservoir" for North San Joaquin. Woodbridge opposed the motion and asserted the motion did "not seek to resolve an actual issue of duty and [wa]s therefore improper." Further, the trial court noted, "[R]ather than focusing on the particular issue raised by [North San Joaquin's] motion, whether [East Bay] owes a duty to [Woodbridge] to release more water than required to satisfy the [permanent regulated base supply], [Woodbridge's] opposition raise[d] a challenge to [East Bay's] practice of allocating stored water to [North San Joaquin]. [Woodbridge] contend[ed] that [East Bay] allocates water to [North San Joaquin] only when it has flood releases and that [Woodbridge] has rights for the diversion of flood releases prior to [North San Joaquin's] rights under Permit 10477."

In reply to Woodbridge's opposition, North San Joaquin argued Woodbridge's complaint sought "a declaration that [East Bay] has a duty to release additional water to satisfy [Woodbridge's] License 5945 before [East Bay] can store water for [North San Joaquin's] Permit 10477." North San Joaquin "admit[ted] that [Woodbridge's] direct diversion rights are prior to [North San Joaquin's] direct diversion rights" but argued "the stored water that [East Bay] allocates and releases to [North San Joaquin] is properly stored by [East Bay] under Permit 10478 and that [Woodbridge] has waived any objection to [East Bay's] storage of said water in the 1965 Agreement." North San Joaquin asserted, "[T]hat [Woodbridge] has waived any prior right to any water initially stored by [East Bay] and

subsequently allocated to [North San Joaquin] and that [North San Joaquin] may therefore properly use such water under Permit 10477 without violating [Woodbridge's] prior rights."

The trial court explained, "[T]he moving papers d[id] not seek direct adjudication of this dispute between [North San Joaquin] and [Woodbridge] as to whether water stored by [East Bay], allocated to [North San Joaquin], and subsequently released by [East Bay] is subject to [Woodbridge's] prior rights." The moving papers instead sought "only adjudication of the issue as to whether [East Bay] must release additional water to [Woodbridge] before storing water that may be subsequently allocated to [North San Joaquin]."

The trial court noted East Bay "filed a concurrently pending motion for summary judgment and/or adjudication which necessarily requires the resolution of the same issue asserted in [North San Joaquin's] motion and requires consideration of the same material facts." Because the trial court granted East Bay's motion and found the language of the 1965 Agreement expresses a clear intent to limit the obligation East Bay may have to release water to Woodbridge above and beyond the permanent regulated base supply and Woodbridge waived any prior right it had to compel the release of additional water by East Bay, the trial court granted North San Joaquin's motion for summary adjudication as well.

Woodbridge appeals from the judgment granting East Bay's motion for summary judgment, granting North San Joaquin's motion for summary adjudication, and denying Woodbridge's motion for summary adjudication.

DISCUSSION

We review the grant of a motion for summary judgment or summary adjudication de novo. (*Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1092.) In that process, we assume the role of the trial court by independently examining the record

17

and evaluate the correctness of the trial court's ruling, not its rationale. (*Moore v. William Jessup University* (2015) 243 Cal.App.4th 427, 433.)

I

*The Waiver And Consent Provisions In The 1965 Agreement Are Not In Conflict*

Woodbridge argues the judgment should be vacated and summary judgment reversed because it did not waive its right to contest unlawful actions by East Bay concerning Mokelumne River water. As we can best glean, Woodbridge asserts the trial court erred by relying on and incorporating the Waiver Provision from the 1965 Agreement into the judgment because Woodbridge believes the Waiver and Consent Provisions in the 1965 Agreement "are facially in conflict" and, accordingly, only the Consent Provision is operative because it is the more specific provision of the two. In Woodbridge's view, it only "waived its right to challenge [East Bay's] lawful exercise of [East Bay's] Mokelumne River water rights" but did not waive "its right to dispute or contest action by [East Bay] that exceeds [East Bay's] water rights or is otherwise unlawful." We find no facial conflict between the Waiver and Consent Provisions.

"The primary object of contract interpretation is to ascertain and carry out the mutual intention of the parties at the time the contract was formed, determined from the writing alone, if possible. [Citations.] When the language of a contract is 'clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language.' " (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688.)

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "This means that '[c]ourts must interpret contractual language in a manner which gives force and effect to every provision' [citation], and avoid constructions which would render any of its provisions or words 'surplusage.' [Citation.] Put simply, '[a] contract term should not be construed to render some of its provisions meaningless or irrelevant.' " (*In re Marriage of Nassimi*, *supra*, 3 Cal.App.5th at p. 688.)

18

The language of each provision should be construed in context, in view of the intended function of the provision and of the contract as a whole. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265.) This may require inquiry into the circumstances under which the contract was made. (Civ. Code, § 1647; *Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 683.) Intent may also be determined from objective manifestations such as "the object, nature and subject matter" of the writing. (See *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.) "The question is what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) "When possible, courts should ' "avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." ' " (*In re Marriage of Nassimi*, *supra*, 3 Cal.App.5th at pp. 688-689.)

We note, because there is no factual dispute concerning the actual terms of the 1965 Agreement, we interpret the 1965 Agreement as a matter of law. (See *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.)

Woodbridge argues the Waiver and Consent Provisions in the 1965 Agreement "are facially in conflict" because the Waiver Provision "states a waiver of all claims against [East Bay] 'relative to the waters of the Mokelumne River' " whereas the Consent Provision "states that Woodbridge agrees and consents only to [East Bay's] proper exercise of its state-issued water rights." In Woodbridge's view, East Bay's interpretation of the Waiver Provision that "Woodbridge waived all rights to contest any action by [East Bay] concerning Mokelumne River water" renders the Consent Provision surplusage because, "if Woodbridge were powerless to contest [East Bay] action concerning Mokelumne River water, then [East Bay] would not require Woodbridge's agreement and consent that [East Bay] may exercise its Mokelumne River water rights as stated in [the Consent Provision]." For ease of review, we again set forth the language of the Waiver and Consent Provisions.

The Waiver Provision provides: "The execution of this Agreement by all the parties hereto, and the performance by [East Bay] of the things to be performed by it hereunder, shall constitute and operate conclusively as a final satisfaction, discharge, waiver and release of all disputes, controversies, claims, demands, causes of action or other objections which [Woodbridge] and Conservation District, or either of them, now have or may hereafter at any time have, including those presently unknown or unanticipated, against or involving [East Bay] relative to the waters of the Mokelumne River and/or [East Bay's] collection, storage, diversion or use thereof; and [Woodbridge] and Conservation District, and each of them, hereby waive the provisions of Section 1542 of the Civil Code of the State of California. The foregoing provisions of this paragraph constitute a material consideration for the execution of this Agreement by [East Bay]."

The Consent Provision provides: "[Woodbridge] and Conservation District hereby agree and consent, subject to the releases of water by [East Bay] as aforesaid, and to the diversions of water aforesaid by [Woodbridge] and Conservation District, to the collection, storage, diversion or use by [East Bay] of the water of the Mokelumne River for the purposes and to the extent specified in the permits heretofore issued by the State of California, or any department or agency thereof, to [East Bay], and in any licenses that may heretofore or may hereafter be so issued."

We are tasked with reading the Waiver and Consent Provisions to avoid rendering any of the provisions meaningless, irrelevant, or unnecessary. Facially, we can do so here because the provisions differ in both purpose and effect.

In the Consent Provision, Woodbridge consented and agreed to East Bay's collection, storage, diversion, and use of the Mokelumne River's water for the purposes of and to the extent specified in East Bay's then-existing permits and any then-existing or future licenses to be issued by the Board, subject to the releases and diversions in the 1965 Agreement. The purpose of the Consent Provision was to resolve all disputes by Woodbridge as to East Bay's exercise of its existing and future water rights in exchange for Woodbridge receiving

20

the reliable and specific water releases identified in the agreement. The provision gives East Bay a basis for a breach of contract claim against Woodbridge should Woodbridge act inconsistent with consenting to East Bay's collection, storage, diversion, and use of the Mokelumne River's water for the purposes of and to the extent specified in East Bay's water rights.

The Waiver Provision on the other hand sets forth the scope of Woodbridge's "voluntary relinquishment of a known right" as to potential future disputes. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 314 [the term "waiver" generally means "voluntary relinquishment of a known right"].) The purpose of the provision is to give East Bay peace of mind that Woodbridge will pursue no further litigation or disputes "against or involving [East Bay] relative to the waters of the Mokelumne River and/or [East Bay's] collection, storage, diversion or use thereof." After several decades of disputes between the parties, this provision was a material consideration for East Bay to provide the releases to Woodbridge under the 1965 Agreement. Whereas the Consent Provision provides East Bay with a basis to assert a breach of contract claim against Woodbridge, the Waiver Provision applies to quash claims, et cetera, that Woodbridge may bring against East Bay.

The provisions are thus not in conflict or inconsistent and the Waiver Provision does not render the Consent Provision surplusage, as Woodbridge asserts. Given this conclusion, we do not address Woodbridge's argument that when a general provision and a specific provision are inconsistent, the specific provision controls, or its argument that an interpretation regarding the conflict between the Waiver and Consent Provisions should be read to avoid an outcome that is extraordinary, harsh, unjust, and inequitable.

To the extent Woodbridge asks us to interpret the Waiver Provision to apply only to claims pertaining to East Bay's use of Mokelumne River water according to its water rights, we find no basis for doing so. Woodbridge has provided us with no legal authority, reasoned analysis, or cogent argument to modify the language of the Waiver Provision in the 1965 Agreement. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 [conclusory statements

21

without argument and authority are deemed forfeited and fail].)  The plain language of the Waiver Provision is clear that the scope of Woodbridge's waiver is broader than merely pertaining to disputes regarding East Bay's use of the river's water pursuant to its water rights.  Indeed, the parties included language specific to East Bay's water rights in the Consent Provision but did not include such language in the Waiver Provision.  Had the parties intended to limit the Waiver Provision to challenges involving East Bay's use of water pursuant to its water rights, we expect the parties would have said so as they did in the Consent Provision.  To read the Waiver Provision as Woodbridge asserts, we would have to read language out of the provision (i.e., strike the broad "relative to the waters of the Mokelumne River" language) and/or read language into the provision (i.e., add the limiting language, "according to its water rights").  We have no power to rewrite a contract. (*Ellison v. City of San Buenaventura* (1975) 48 Cal.App.3d 952, 962.)

We further find no merit in Woodbridge's argument that East Bay has, in its cross-complaint and briefing, "seemed to concur that Woodbridge's waiver was limited to [East Bay's] lawful exercise of its water rights."  (Boldface & capitalization omitted.)  First, we find no such concession in East Bay's statements identified by Woodbridge.  Statements that Woodbridge waived the right to challenge East Bay's use of the Mokelumne River pursuant to East Bay's water rights do not lead to the conclusion that East Bay's understanding of the Waiver Provision was limited to disputes pertaining to its lawful exercise of its water rights. Second and as Woodbridge acknowledges, East Bay "[e]lsewhere in its pleading and briefing . . . contended that Woodbridge's waiver was broader—prohibiting Woodbridge from contesting any action by [East Bay] with respect to Mokelumne River water, on any basis, even if that action exceeds [East Bay's] water rights or is otherwise unlawful."

Woodbridge further argues East Bay "cannot make a clear showing that Woodbridge intended to give up its right to contest unlawful future action by [East Bay] concerning Mokelumne River water" nor can it "establish such a waiver by clear and convincing evidence that does not leave the matter doubtful or uncertain, given the limited scope of

22

Woodbridge's agreement and consent as stated in [the Consent Provision]." We do not consider Woodbridge's general and broad reference to "unlawful future action" in determining whether the trial court erred in granting East Bay's motion for summary judgment *in this case*. There can be no question that there is clear and convincing evidence Woodbridge agreed to the Waiver Provision because it is undisputed that it signed the 1965 Agreement.

For the foregoing reasons we find no articulable argument of prejudicial error on which to reverse the trial court's verbatim incorporation of a portion of the Waiver Provision into the judgment. We note Woodbridge makes a summary assertion that the trial court failed to consider whether Woodbridge "waive[d] its right to dispute or contest action by [East Bay] concerning Mokelumne River water that exceeds [East Bay's] water rights or is otherwise unlawful." To the extent Woodbridge asserts the trial court erred in that regard, and granted East Bay's motion for summary judgment despite failing to consider a request for declaratory relief asserted in Woodbridge's complaint, Woodbridge provides us with no reasoned analysis upon which to reverse the trial court's judgment. We thus disregard the argument. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

To the extent Woodbridge asks us to provide an opinion as to the meaning and application of the Waiver Provision (i.e., whether the Waiver Provision bars Woodbridge from challenging "unlawful action" by East Bay regarding Mokelumne River water or whether the provision is more limited to disputes that existed at the time the parties entered into the agreement), we decline to do so. That is not our function. Our role is to determine whether, based on the arguments presented by the appellant, the trial court prejudicially erred in making the ruling that is the subject of the appeal. In its appeal, Woodbridge asserts only that the trial court erred in including a portion of the Waiver Provision in the judgment because the Consent Provision governs over the Waiver Provision due to a facial conflict between the provisions. As we have already explained, we disagree with that assertion.

23

We also note Woodbridge acknowledges the "four areas where it s[ought] a declaration that it may dispute or contest [East Bay] action that does not 'adher[e] to the terms and conditions of [East Bay's] water rights and other applicable laws and regulations' " are " 'inchoate' " and it did not "seek declaratory relief to resolve any particular dispute, but rather a declaration that the 1965 Agreement does not preclude it from contesting, at some time in the future, action in these areas that exceeds [East Bay's] water rights or is otherwise unlawful." It asserts, "[T]here are no particular disputes identified in [its] request for declaratory relief, but instead only *general* areas of potential dispute." We agree with East Bay that Woodbridge seeks an advisory opinion unrelated to any actual or present controversy.

"The ripeness element of the doctrine of justiciability is intended to prevent courts from issuing purely advisory opinions. [Citation.] It is 'primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.' [Citation.] In an action for declaratory relief under Code of Civil Procedure section 1060, an ' "actual controversy" . . . is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do.' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573-1574.) It is axiomatic that we do not provide opinions on hypothetical disputes that may never ripen in the future.

## II

### *The Trial Court's Judgment Was Not Entered In Error*

Woodbridge argues the judgment should be reversed because "declaratory relief concerning Woodbridge's priority over North San Joaquin had not yet been resolved." (Boldface & capitalization omitted.) Woodbridge asserts the trial court erred in entering

24

judgment because it "expressly (and correctly) noted that at least one issue remained unresolved and for further litigation" as to North San Joaquin's complaint in intervention. It further argues the trial court erred by granting East Bay's motion for summary judgment because Woodbridge sought "declaratory relief that its contracts with [East Bay] 'do not release or excuse [East Bay] or [North San Joaquin] from the priority of Woodbridge's License 5945 and License 8214 over diversions and storage of water under [North San Joaquin's] Permit 10477.' " In Woodbridge's view, "[t]o the extent that [East Bay] purports to release water to North San Joaquin, or to 'assign' water that it has stored under its own permit to North San Joaquin, those issues are implicated by Woodbridge's request for declaratory relief and were not decided in the superior court." We find no merit in these contentions.

Initially, we note that, if the trial court erred in entering judgment before adjudicating an issue raised in North San Joaquin's complaint in intervention, i.e., *an issue asserted by North San Joaquin*, it is North San Joaquin, not Woodbridge, who may challenge the trial court's judgment for failing to resolve all of *North San Joaquin's* requests for relief. North San Joaquin, however, did not appeal.

Second, the trial court did not fail to "decide" the question as to the declaratory relief Woodbridge requested in its complaint. The trial court explained East Bay was entitled to the benefit of the Waiver and Consent Provisions in the 1965 Agreement because there were no allegations that East Bay failed to perform its obligations under the agreement. We thus presume the trial court found the Waiver Provision barred Woodbridge's complaint and requests for declaratory relief *against East Bay*. (See *Salehi v. Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1154 [the judgment of the trial court is presumed correct, and we indulge all intendments and presumptions to support the judgment].) Woodbridge did not name North San Joaquin as a defendant and seek declaratory relief as to the relative priority of their respective water rights vis-à-vis one another. Given that we have already rejected Woodbridge's sole argument as to the trial

25

court's purported error in relying on the Waiver Provision, and Woodbridge provides no further argument as to why the specific declaratory relief requested falls *outside* the scope of the provision, we find no articulated argument upon which to reverse the trial court's judgment.

Even if, as Woodbridge asserts, "the priority of Woodbridge's water rights over those of North San Joaquin with respect to flood control or other releases that [East Bay] *does make* remains an open dispute" and the "issue was never presented or substantively addressed below," that assertion alone does not support a conclusion that the trial court erred, and the judgment should be reversed. Finding no basis to reverse the judgment, we affirm.

## DISPOSITION

The judgment is affirmed. East Bay and North San Joaquin shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)-(2).)

/s/_____
ROBIE, Acting P.J.

We concur:

/s/_____
MAURO, J.

/s/_____
MCADAM, J.[*]

---

[*] Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26